## Commonwealth v. Foltz.

*Homicide — Murder — Voluntary manslaughter—Parts of dying declaration admitted on behalf of defendant — Presumption from use of deadly weapon upon vital part of deceased's body—"Unwritten law"—"Irresistible impulse"—Preponderance of evidence.*

1. Where counsel for the Commonwealth in a murder case had in their possession what is known as a dying declaration of the deceased, that is, a written statement by him, or on his behalf, made at a time when he realized and believed his death to be impending, but, owing to certain legal requirements, counsel for the Commonwealth thought this statement to be incompetent as evidence coming from them, although counsel for the defendant waived any legal objection thereto and requested counsel for the Commonwealth to place the declaration in evidence, and the Commonwealth's counsel, exercising their just and legal rights, declined to do so, but exhibited the declaration to the defendant's counsel, by whom the declaration was offered in evidence, portions thereof were admitted and became in a way the basis of one of the lines of defence.

2. When the term "malice" is used in connection with a homicide case, it is not to be understood merely as a particular ill-will, a spite or a grudge. Malice is a legal term implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. A specific and malicious intention to kill is the essence of wilful, deliberate and premeditated killing. If a malicious intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated.

3. Unless there is evidence tending to show the contrary, there is a presumption of murder under the law arising from the use of a deadly weapon upon a vital part of another's body resulting in death, but this presumption of law rises no higher than murder of the second degree. The law regards the circumstance that a deadly weapon was used as evidence that a specific and malicious intention to kill existed. The jury may infer such intent from the use of such a weapon, but they are not bound to do so. The law will sustain a finding of intent from the single fact that a deadly instrument was used, but it is for the jury in every case to derive their own conclusion as to the intent from the circumstances which the case discloses.

4. There is no such thing in the jurisprudence of Pennsylvania as that which sometimes is called or designated the "unwritten law." The fact that one man sexually corrupts the wife of another will not legally justify the wronged husband in killing his wife's paramour. But while that is true, nevertheless, it is competent to put in evidence the facts surrounding the case, so that the jury may be better able to judge of and determine the conditions of mind and the intents, motives and responsibilities of a slayer at the time of committing the homicide, and the plans, thoughts and purposes of the deceased immediately prior to meeting the assault. In order that the determination of the case by the jury may be unerring and their judgment sound, they are entitled to all the relative facts from every viewpoint and angle.

5. The law of Pennsylvania recognizes what is termed an "irresistible impulse," which destroys the freedom of the will of an individual, as a specific form of insanity. An irresistible impulse, in the law of insanity, is an irresistible inclination to kill or commit some other offence consisting of some unseen pressure on the mind drawing it to consequences which it sees but cannot avoid, holding it under coercion, so that, while it clearly perceives the result, it is incapable of resisting. Irresistible impulse is not convertible with passionate propensity, no matter how strong in persons not insane.

6. The true test in Pennsylvania is whether or not the defendant in a criminal case, at the time of committing the act complained of, had the ability to distinguish between right and wrong, and the ability to adhere to the right and to avoid the wrong. It is not enough for a man to understand the nature and consequences of his act and to know that it is wrong. He must have the will-power also to refrain from doing the act before he may be convicted of any offence under the law.

Commonwealth v. Foltz.

7. If an irresistible impulse be alleged as an excuse for the killing, it must be proved on behalf of the defendant to the satisfaction of the jury by a fair preponderance of the evidence, or it must appear to the satisfaction of the jury from a fair preponderance of all the evidence in the case, that the act was committed through an irresistible impulse. The raising of a reasonable doubt on behalf of the defendant as to whether or not he acted on an irresistible impulse is not sufficient to bring about his acquittal. The law is that if there be a reasonable doubt that any offence has been committed by the prisoner, it operates to acquit, but if the evidence establishes the killing by the prisoner with a deadly weapon, an illegal homicide of some kind is made out, and the burden then falls on the defence to show that the act was excusable as done on an irresistible impulse. If the evidence on the part of a defendant leaves his extenuation in doubt, he cannot be acquitted of all crime, but must be convicted of homicide in some of its degrees, of manslaughter at least.

8. To preponderate means to exceed in weight and influence. A preponderance of the evidence is where the proof on one side of a particular question overbalances the proof on the other side of the same question. It does not mean, necessarily, the testimony of a larger number of witnesses, but it means the evidence in which the jury have the more confidence and upon which they prefer to rest their judgment.

See Com. v. Grimm, 5 D. & C. 287.

Charge to the jury. O. & T. Fayette Co., Dec. T., 1923, No. 9.

*Alfred E. Jones*, First Assistant District Attorney, and *Dean D. Sturgis*, Second Assistant District Attorney, for Commonwealth.

*W. C. McKean, John Duggan, Jr.*, and *R. M. Carroll*, for defendant.

VAN SWEARINGEN, P. J., March 26, 1924.—Members of the jury: It is practically conceded in this case, though not specifically admitted, that the defendant, Jacob K. Foltz, shot Benjamin R. Younkin at the place of business of the Hyatt Motor Company, at the corner of Second Street and Crawford Avenue, in the City of Connellsville, where Younkin was employed, near 11 o'clock in the forenoon of Wednesday, Nov. 21, 1923, and that Younkin died in the Cottage State Hospital at Connellsville the following morning at a little after 1 o'clock as a result thereof.

The autopsy on the body of the deceased showed that at least four bullets had entered the body. One bullet entered the body on the left side of the chest, near the left nipple, passing downward through the greater curvature of the stomach and leaving the body through the left side of the back above the left hip bone. Another bullet entered the back just below the left shoulder blade, passing upward and to the left, and was found in the left pleural cavity of the body. There is evidence that this bullet tore a hole in the left lung. A third bullet entered the body beneath the right shoulder blade, passing upward through the right lung, and fracturing the third rib. A fourth bullet wound of entrance was found below the right shoulder blade. This wound was traced into the right lung, but the bullet was not found, there being some evidence that the bullet may have got into the large air tubes of the lung and thus been carried out of the body. There is some evidence that another bullet entered the left back at the point of exit of the bullet here designated as the first one, and there is evidence of a circular abrasion on the right arm six inches below the shoulder. Death was caused by hemorrhage.

There is evidence on the part of the Commonwealth that the defendant came to the Hyatt garage the Saturday evening preceding the shooting between 7 and 8 o'clock and inquired for Younkin, but was told that Younkin did not work in the evenings, and was directed toward where Younkin lived, but nothing further is shown to have occurred that night. On the morning of the shooting, it is alleged on the part of the Commonwealth, Younkin was

working on an automobile just outside the Hyatt garage when the defendant appeared there, and directing his words to Younkin said, "Mr. Younkin, I would like to speak to you a minute," in response to which Younkin turned and looked and said, "All right, in a minute," and that soon the two men started toward the garage, walking close together, nearly side by side, that then a shot was heard and Younkin was seen falling toward the building, with Foltz standing holding a revolver toward Younkin, which was fired again, and that thereafter several additional shots were heard. There is evidence on the part of the Commonwealth by J. L. Hyatt, the owner of the garage, who was inside the building at the time of the shooting, that following the shooting the defendant walked into the garage toward the witness and said to him, "Mr. Hyatt, you know me, I have shot one of your men, and I want you to walk along with me to the police station," and that Younkin soon came into the garage, saying: "I'm shot." Hyatt testified that he heard five shots in all, that he took the defendant to the police station in his car and delivered him to Chief of Police Peter M. Murphy, and while this was going on, it is alleged on the part of the Commonwealth, Thomas Davin, one of Hyatt's workmen, was taking Younkin to the hospital in another car. To another workman Younkin is alleged to have said: "Foltz shot me."

There is evidence on the part of the Commonwealth that the revolver which it is alleged Foltz had was picked up near the Hyatt garage and taken and given to Chief of Police Murphy, to whom it was admitted by the defendant that this was the gun he used. There is evidence that at the hospital, during the afternoon of the day of the shooting, in a conversation with his wife relative to his condition, Younkin said to his wife that he was not going to live, that he could not get well, but was going to die, and that at another time he said to his wife, "I'm not going to make it," and that she replied to him, "Oh, yes, you will, save your strength and your energy and you will pull through," and that he then said, "No, he did not give me a chance, he shot me down like a dog." There is the testimony also of Joe Percy, a brother of Mrs. Younkin, the widow of the deceased, who has said that at the hospital he heard Younkin say that he was not going to make it, that Foltz did not give him a chance, that he shot him down like a dog.

In brief, that is the sum of the testimony on the part of the Commonwealth. It has been proved, it is alleged by the Commonwealth, who perpetrated the killing, and when, and where, and how. No conversation of any kind, except that which we have mentioned, is shown by the Commonwealth to have occurred between the two men at the time of the shooting, or in any way connected therewith. The Commonwealth showed no motive for the crime, and possibly could not do so under the rules of evidence, and they were content to rest their case on the evidence offered by them, as they had a right to do. Counsel for the Commonwealth had in their possession what is known as a dying declaration of Younkin, that is, a written statement by him, or on his behalf, made at a time when he realized and believed his death to be impending. Owing to certain legal requirements, counsel for the Commonwealth thought this statement to be incompetent as evidence coming from them, although counsel for the defendant waived any legal objection thereto, and requested counsel for the Commonwealth to place the declaration in evidence. This the Commonwealth's counsel, exercising their just and legal rights, declined to do, but they exhibited the declaration to the defendant's counsel, by whom the declaration was offered in evidence, and portions thereof were admitted and became in a way the basis of one of the lines of defence.

Commonwealth v. Foltz.

The most material part of Younkin's dying declaration, as introduced under the circumstances stated, was this: "A colored fellow came and asked me to do some work on a transmission cover. I went outside, where I was when Foltz came. He said: 'Younkin, I want a word with you.' I said: 'All right.' I put four screws in the transmission cover, picked up my tools and went over, when he says: 'Do you know me.' I said: 'I know who you are.' He says: 'Do you know my wife?' I said: 'I know who she is.' He says: 'You have been with her.' I said: 'Quite a bunch around the Western Maryland had been with her. I made a mistake going out with her.' Then he pulled the gun and shot. When he pulled the gun I struck at him with my fist, but he jooked. I wanted to get close, and kept swinging around trying to dodge the bullets."

Hazel Foltz, the wife of the defendant, took the witness-stand on behalf of her husband and testified to a serious of unlawful intimacies between herself and Younkin in his lifetime, resulting finally in his becoming the father of her fourth child, born Aug. 14, 1923. She said she first met Younkin during the second week of April, 1922, and went automobile riding with him in company with others of her friends, and that from April, 1922, to August, 1922, the automobile rides were kept up, Younkin and Mrs. Foltz going alone after Decoration Day of that year. Mrs. Foltz testified that there were no unlawful intimacies between herself and Younkin prior to August, 1922, although he had suggested closer relationships several times, which she had refused, but that in August, 1922, their automobile rides largely ceased, and they met by appointment at an apartment house in Connellsville, where their sexual relations began, which continued about once a week until October, 1922, when the defendant went to West Virginia to work, and the meeting place of Younkin and Mrs. Foltz was transferred to Mrs. Foltz's own home at Dunbar, where their unlawful relationships already begun were continued, Younkin visiting Mrs. Foltz there probably twice a week. Mrs. Foltz has testified that on Nov. 17, 1922, which was her wedding anniversary, she prepared a supper, which was sat down to by Younkin and herself, and that as she was talking to Younkin about it he remarked that it seemed peculiar that a woman should eat supper on her wedding anniversary with another man than her husband, to which Mrs. Foltz assented. According to the testimony of Mrs. Foltz, things continued in this way until about Christmas, 1922, when she discovered she was pregnant with a child of which Younkin was the father, and that when she told Younkin about it, he said he was glad of it because that was what he wanted, telling her that she would have the joke and laugh on her husband. Mrs. Foltz testified that the illicit intercourse was kept up until a month before her child was born, after which Younkin wrote her, asking her to return to him a string of pearls and some other small presents which he had given her. Mrs. Foltz has said that she wrote Younkin a letter in reply to the one she received from him, but, not knowing to what address to mail it, she put it in her dresser drawer, where her husband found it on Nov. 17, 1923, the eighth anniversary of their wedding, and that, in response to his demands to know the truth, she told him all that she had told here in court. She has said that he became as though dazed and entirely unnatural. Counsel for the defendant has had Mrs. Foltz relate to you very fully and with great detail her actions with Younkin from the time she first met him until the time of his death, and you have the whole narrative before you for your consideration. Mrs. Foltz has said that when her husband found the letter in her dresser drawer, he fell to the floor, apparently unconscious.

There is evidence by Mrs. Foltz that Younkin was kind and flattering to her and that she loved him more than she did her own husband. She said she and her husband had not been out socially together later than a year before she met Younkin. She testified that she and Younkin decided they would throw themselves open to divorce, and that they wrote letters to each other which they expected her husband and his wife to find. There is evidence by Mrs. Foltz that on the Saturday night prior to the shooting her husband went to Connellsville to see Younkin and tell him he would have to take and take care of Mrs. Foltz and her last child, of which Younkin was the father, and that her husband said he would not do any harm to anybody. There is evidence by Chief of Police Murphy of Connellsville that at the police station the defendant said he asked Younkin just before the shooting if he knew him or his wife, and that Younkin said "No," and that Foltz said he then shot six times at him for lying to him.

Another defence alleged on behalf of the defendant is that at the time the shots were fired by the defendant which caused the death of the deceased, the defendant was suffering from a specific form of insanity known as an "irresistible impulse." Preliminarily, it was shown that David C. Foltz, now sixty-eight years of age, the father of the defendant, who, formerly, was a very keen and energetic business man, for the last five or six years has been on the decline mentally and is verging now on insanity. It is in evidence that Henry W. Foltz, a brother of David C. Foltz, and an uncle of the defendant, and Catharine Nickolas, a sister of David C. Foltz, and an aunt of the defendant, each has been confined for certain periods in the Dixmont Hospital for the Insane, the latter having been there twice, and having died there, and her brother named having died at his home after having been released from that institution. Dr. Edward E. Mayer and Dr. Paul H. Franklin, specialists in mental and nervous diseases, both of whom were in court practically all the time from the beginning of the trial to its close, having heard or read all of the evidence in the case, examined the defendant physically, and noticed the conduct and demeanor of the defendant during the course of the trial, and basing their judgments on all this, each has expressed his opinion that at the time of the shooting the defendant was in a twilight or abnormal or dazed state of mind causing him to be governed by an irresistible impulse to kill Younkin, which constituted a form of insanity. Each of the specialists said that while in that condition of mind a man may know right from wrong and be conscious of what he is doing, but be without the power to choose the course he will pursue. In rebuttal of the opinions of these specialists the Commonwealth has introduced the testimony of two other specialists in mental and nervous diseases, Dr. Theodore Diller and Dr. E. B. McCreedy, both of whom were present during the trial and have had the same opportunities as the other experts to judge of the condition of mind of the defendant at the time the fatal shots were fired, and each of these physicians has expressed it as his opinion that the defendant was sane when the shots were fired, that the defendant had the power of choosing between right and wrong, while suffering from a high emotional state of mind, though each of these specialists conceded that the defendant might have been controlled by an irresistible impulse to kill.

All these experts were examined and cross-examined with great care and ability, and the results to be reached from their testimony is for your consideration and determination. J. L. Hyatt, who took the defendant to the police station after the shooting occured; Peter M. Murphy, the Chief of Police of Connellsville, and W. M. Wilson, the warden of the county jail where the

defendant is confined, each has testified that he observed the manner and actions of the defendant following the shooting, and that he neither saw nor heard anything about the defendant indicating an unsound mind. So far as the evidence in the case shows, this is the first time the defendant ever was alleged to be afflicted with insanity.

There have been corroborations in the details of the evidence; there have been contradictions and denials. All these are for you to recall in connection with the more important elements of the evidence, to which we have referred directly, and for you to take into consideration in arriving at your verdict.

Murder is committed when a person of sound memory and discretion unlawfully kills any reasonable creature in being, under the peace of the Commonwealth, with malice aforethought, express or implied. Malice in this connection is not to be understood merely as a particular ill-will, a spite or a grudge. Malice is a legal term implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

It is provided by the law of this State that all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate, any arson, rape, robbery, burglary or kidnapping shall be deemed murder in the first degree, and that all other kinds of murder shall be deemed murder in the second degree. A specific and malicious intention to kill is the essence of wilful, deliberate and premeditated killing. If a malicious intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to' enable the mind fully to frame the design to kill and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary in which to form the intention to kill, but leaves the existence of a fully-formed intent as a fact to be determined by the jury from all the other facts and circumstances in the evidence.

All murder not of the first degree necessarily is of the second degree, and includes all unlawful killing under circumstances of depravity of heart and a disposition of mind regardless of social duty, but where no intent to kill exists or can reasonably be inferred. Therefore, in all cases of murder, if no intention to kill can be inferred or collected from the circumstances, the verdict should be murder of the second degree.

All homicide is presumed to be malicious, but the presumption rises no higher than murder of the second degree. The burden is on the Commonwealth to show such facts as will justify the jury in returning a verdict of murder of the first degree.

Voluntary manslaughter is where injuries are inflicted unlawfully and sometimes intentionally, under the influence of passion, but without legal malice, and death ensues. The passion may be that either of anger or terror, provided it reach a degree of intensity sufficient to obscure temporarily the reason of the person affected. Passion in this sense means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection. Although anger is the passion usually existing in such cases, yet any other passion, as sudden resentment or terror, rendering the mind incapable of cool reflection, may reduce the

grade of the crime. But to reduce the crime, the circumstances must show an absence of cool depravity of heart or wanton cruelty. If reason has its sway, the killing will be murder.

In every criminal case the person accused of crime is presumed to be innocent until his guilt is clearly established, and it is incumbent on the Commonwealth to prove, to the satisfaction of the jury, beyond a reasonable doubt, the presence of every ingredient necessary to constitute the crime charged in the indictment. That burden never shifts, but rests on the prosecution throughout; so that in any case a conviction can be had only after the jury have been convinced, beyond a reasonable doubt, of the defendant's guilt. In deciding upon the case or upon any material part of it, it is the duty of the jury to give the prisoner the benefit of any reasonable doubt arising out of the evidence which prevents them from coming to a satisfactory conclusion. But such doubt must arise fairly out of the evidence and not merely be fancied or conjured up. You must not raise a mere fanciful or ingenious doubt to escape the consequences of an unpleasant verdict. A reasonable doubt is such a doubt as, after careful thought and investigation, would cause a reasonable and prudent man to hesitate in an important business matter of life. It must be an honest doubt, such a difficulty as fairly strikes a conscientious mind and clouds the judgment. If the mind be fairly satisfied of a fact on the evidence, as much so as would induce a man of reasonable firmness and judgment to take the fact as true, and to act upon it in a matter of importance to himself, it is sufficient upon which to rest a verdict.

Seventeen witnesses were called who have testified that the reputation of the defendant for peace and good order prior to this trouble was good. Evidence of good character is substntive and positive proof in the prisoner's behalf, and may of itself give rise to a reasonable doubt as to his guilt which otherwise would not exist, by making it improbable that a person of such character would commit the offence charged in the indictment. Such evidence is not a mere makeweight thrown in to assist in the production of a result that would happen at all events, but is to be regarded as evidence of a substantive fact, like any other evidence tending to prove innocence, and is to be weighed and considered by the jury in connection with all the other evidence in the case.

Unless there is evidence tending to show the contrary, there is a presumption of murder under the law arising from the use of a deadly weapon upon a vital part of another's body resulting in death, but this presumption of law rises no higher than murder of the second degree. The law regards the circumstance that a deadly weapon was used as evidence that a specific and malicious intention to kill existed. The jury may infer such intent from the use of such a weapon, but they are not bound to do so. The law will sustain a finding of intent from the single fact that a deadly instrument was used, but it is for the jury in every case to derive their own conclusion as to the intent from the circumstances which the case discloses.

There is no such thing in the jurisprudence of Pennsylvania as that which sometimes is called or designated the "unwritten law." The fact that one man sexually corrupts the wife of another will not legally justify the wronged husband in killing his wife's paramour. But while that is true, nevertheless, it is competent to put in evidence the facts surrounding the case, so that the jury may be better able to judge of and determine the conditions of mind, and the intents, motives and responsibilities of a slayer at the time of committing the homicide, and the plans, thoughts and purposes of the deceased immediately prior to meeting the assault. In order that your determination of the

Commonwealth v. Foltz.

case may be unerring and your judgment sound, you are entitled to all the relative facts from every viewpoint and angle.

The law of Pennsylvania recognizes what is termed an "irresistible impulse," which destroys the freedom of the will of an individual, as a specific form of insanity. An irresistible impulse, in the law of insanity, is an irresistible inclination to kill, or commit some other offence, consisting of some unseen pressure on the mind, drawing it to consequences which it sees but cannot avoid; holding it under coercion, so that, while it clearly perceives the results, it is incapable of resisting. Irresistible impulse is not convertible with passionate propensity, no matter how strong, in persons not insane. In other words, the irresistible impulse of the lunatic, which confers irresponsibility, is essentially distinct from the passion, however violent, of the sane, which does not confer irresponsibility. The true test in Pennsylvania is whether or not the defendant in a criminal case, at the time of committing the act complained of, had the ability to distinguish between right and wrong, and the power to adhere to the right and to avoid the wrong. It is not enough for a man to understand the nature and consequences of his act and to know that it is wrong. He must have the will-power also to refrain from doing the act before he may be convicted of any offence under the law. If an irresistible impulse be alleged as an excuse for the killing, it must be proved on behalf of the defendant to the satisfaction of the jury by a fair preponderance of the evidence, or it must appear to the satisfaction of the jury from a fair preponderance of all the evidence in the case, that the act was committed through an irresistible impulse. The raising of a reasonable doubt on behalf of the defendant as to whether or not he acted on an irresistible impulse is not sufficient to bring about his acquittal. The law is that if there be a reasonable doubt that any offence has been committed by the prisoner, it operates to acquit; but if the evidence establishes the killing by the prisoner with a deadly weapon, an illegal homicide of some kind is made out, and the burden then falls on the defence to show that the act was excusable, as done on an irresistible impulse. If the evidence on the part of a defendant leaves his extenuation in doubt, he cannot be acquitted of all crime, but must be convicted of homicide in some of its degrees, of manslaughter at least. But if his extenuation be proved to the satisfaction of the jury by a fair preponderance of the evidence, he should be acquitted. While all the ingredients of the Commonwealth's case must be shown beyond a reasonable doubt, this severe rule does not apply in considering an affirmative defence. There, a fair preponderance of the evidence in favor of the defendant is sufficient. To preponderate means to exceed in weight and influence. A preponderance of the evidence is where the proof on one side of a particular question overbalances the proof on the other side of the same question. It does not mean, necessarily, the testimony of a larger number of witnesses, but it means the evidence in which the jury have the more confidence and upon which they prefer to rest their judgment.

As we have said, the essence of a wilful, deliberate and premeditated killing is a specific and malicious intention to take life. If the defendant was sane, and you are satisfied in this case, beyond a reasonable doubt, that the defendant inflicted on Younkin the bullet wounds that caused his death, and that the killing of the deceased was unlawful and malicious, wilful, deliberate and premeditated in the sense in which we have explained those terms to you, that there was present in the mind of the defendant, at the time of the shooting of the deceased, a specific, conscious and malicious intent to take the life of the deceased, then you should return a verdict that the defendant is guilty

Commonwealth *v.* Foltz.

of murder of the first degree. If the defendant was sane, and you are satisfied, beyond a reasonable doubt, that the defendant inflicted on Younkin the bullet wounds that cauesd his death, and that the killing was done with legal malice, that is, through wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, but without any specific intent on the part of the defendant to take the life of the deceased, then you should return a verdict that the defendant is guilty of murder of the second degree. The degree of crime as between murder of the first degree and murder of the second degree is always a matter for the determination of the jury.

If the defendant was sane, and you are satisfied, beyond a reasonable doubt, that the defendant inflicted on Younkin the bullet wounds that caused his death, but find that at the time of inflicting the bullet wounds on the deceased the defendant was not actuated by legal malice, that his conduct was not the result of depravity of heart, wickedness of disposition, recklessness of consequences, cruelty, or a mind regardless of social duty, but that he acted under the influence of anger, rage, or sudden resentment, brought on by the conduct or words of the deceased, without time to cool, upon provocation sufficient to render the mind incapable of cool reflection, then you should return a verdict that the defendant is guilty of voluntary manslaughter.

If you are satisfied, beyond a reasonable doubt, that the defendant inflicted on the deceased the injuries from which he died, but find from a fair predonderance of the evidence that at the time of the shooting of the deceased the defendant acted under what we have explained to you as an irresistible impulse, an insane mind, and that at the time of committing the act complained of, though the defendant had the ability to distinguish between right and wrong, and understood the nature and consequences of his act and knew it to be wrong, he did not have the will-power to refrain from doing the act, by reason of an irresistible impulse to kill, then you should return a verdict that the defendant is not guilty. If, in this case, you find the defendant not guilty, your verdict in form should be: The defendant is not guilty, having been insane at the time the offence was committed.

From Luke H. Frasher, Uniontown, Pa.

NOTE 1.—Syllabus by the Court.
NOTE 2.—The defendant was convicted of voluntary manslaughter, and no appeal was taken.